# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 26-1178

## METROPOLITAN GOVERNMENT OF NASHVILLE
## AND DAVIDSON COUNTY, TENNESSEE,

*Petitioner,*

v.

## FEDERAL AVIATION ADMINISTRATION AND BRYAN BEDFORD,
## AS ADMINISTRATOR OF THE FAA, IN HIS OFFICIAL CAPACITY,

*Respondents.*

## PETITION FOR REVIEW OF AGENCY FAILURE
## TO TIMELY COMPLY WITH STATUTORY MANDATE

M. Roy Goldberg, Esq.
D.C. Bar 416953
D.C. Circuit Bar No. 39860
CLARK HILL PLC[1]
1001 Pennsylvania Avenue, N.W.
Suite 1300 South
Washington, DC 20004
Telephone:  (202) 552-2388
Email: rgoldberg@clarkhill.com

Counsel for Petitioner Metropolitan
Government of Nashville and Davidson
County, Tennessee

Dated: July 1, 2026

---

[1]On July 13, 2026, the address of Clark Hill PLC's Washington, D.C. office will move to 601 13th Street, N.W., Suite 600 South, Washington, D.C. 20005.

ClarkHill\M8368\498900\288520409.v1-7/1/26

## PETITION FOR REVIEW

Pursuant to 49 U.S.C. § 46110 and the Administrative Procedure Act, 5 U.S.C. §§ 701–706, Petitioner respectfully petitions this Court for review of the Federal Aviation Administration's ("FAA") unlawful failure to act, and constructive approval of, the State of Tennessee's unlawful attempted transfer of the governance of Nashville International Airport ("BNA") and John C. Tune Airport ("JWN"), in violation of Section 757 of the FAA Reauthorization Act of 2024 ("Section 757"). Congress enacted Section 757 to prohibit the FAA from accepting or facilitating the transfer of airport governance implicated in ongoing litigation, including the current dispute pending in the U.S. District Court for the Middle District of Tennessee.

Section 757 imposes a mandatory duty on the FAA to state that it will not approve such a transfer until litigation concludes. In spite of Congress' clear directive to the FAA, the FAA has failed to issue the required statement and has effectively permitted the State of Tennessee to proceed toward assuming governance of the Airports. This failure constitutes agency action unlawfully withheld and unreasonably delayed, and arbitrary, capricious, and contrary to law.

## JURISDICTION AND VENUE

This Court has jurisdiction under 49 U.S.C. § 46110(a), which provides for review of FAA orders and final agency action. In addition, no final agency action is necessary to pursue relief under 5 U.S.C. § 706(1) for the FAA's failure to timely

ClarkHill\M8368\498900\288520409.v1-7/1/26

take action that is required by Congress.

Venue lies in this Court pursuant to 49 U.S.C. § 46110 and because (1) FAA resides in Washington, D.C.; and (2) the challenged agency action arises from federal aviation regulation and oversight.

FAA's action (or constructive approval through inaction) constitutes an "order" within the meaning of 49 U.S.C. § 46110, as it represents the agency's definitive position regarding airport sponsorship and governance.

FAA's failure to act where there is a discrete, legally required duty is reviewable under 5 U.S.C. § 706(1).

## PARTIES

Petitioner Metropolitan Government of Nashville and Davidson County ("Metro Nashville") created the Metropolitan Nashville Airport Authority ("MNAA"), which in turn owns and operates, and is the federally-recognized "sponsor" of, BNA and JWN. Pursuant to Title 42 of the TN Code, MNAA is the agency and instrumentality of Metro Nashville while at the same time being an independent governmental entity. Metro Nashville nominates and confirms the MNAA Board of Commissioners in whom is vested all power of MNAA under Title 42. Petitioner has interests directly affected by the unlawful transfer of governance of the Airports under Petitioner's jurisdiction.

2

Respondent FAA is an agency of the United States responsible for regulating civil aviation and overseeing compliance with federal aviation law.

Respondent Bedford is the Administrator of the FAA. He is named in his official capacity only.

## ORDER UNDER REVIEW

This Petition seeks review of:

1.     FAA's approval, recognition, or acquiescence in the State of Tennessee's attempted transfer of governance, sponsorship, ownership, or operational responsibility for BNA and JWN to a newly constituted State-controlled board; and/or

2.     FAA's failure to act in accordance with its statutory obligations under Section 757 of the FAA Reauthorization Act of 2024, which has the practical effect of allowing such transfer to proceed.

To the extent required, this Petition also challenges any final or reviewable agency action reflected in correspondence, communications, or omissions, including but not limited to:

- FAA's failure to respond to Metro Nashville's May 20, 2026 letter, June 28, 2026 letter, and June 29 Motion for Administrative Stay; and

- Any determination permitting the governance change at MNAA to take effect on or about July 1, 2026.

3

## STANDING OF PETITIONER

Petitioner has standing to pursue this Petition for Review because it is directly and negatively impacted by the FAA's refusal to comply with its obligations under Section 757. As a result of FAA's noncompliance with the law, Metro Nashville now stands to lose its long-held right to nominate and confirm the MNAA Board of Commissioners in whom is vested all power of MNAA under Title 42. Such noncompliance by FAA will result in Petitioner losing its right to nominate and confirm the MNAA Board of Commissioners. Had FAA simply followed its statutory obligations under Section 757, Metro Nashville would not be losing that right.

## STATUTORY BACKGROUND

Section 757 of the FAA Reauthorization Act of 2024 requires the FAA to take affirmative steps to ensure that it does not accept or facilitate the transfer of airport governance while specified litigation is pending. The statute imposes a nondiscretionary obligation: the FAA must state that it will not accept such a transfer prior to the conclusion of the litigation.

## FACTUAL BACKGROUND

Metro Nashville established the MNAA, which owns and operates BNA and JWN. The MNAA is recognized by the FAA as the sponsor of BNA and JWN, subject to FAA regulation, including, without limitation, the "Grant Assurance"

4

obligations that a federal-funded airport sponsor must follow, pursuant to 49 U.S.C. § 47107. BNA is the largest airport in Tennessee. Handling more passenger arrivals and departures than all other airports in the state combined, it serves nearly 25 million travelers annually. JWN is the largest general aviation airport in the State.

In 2026, the State of Tennessee ("State") enacted legislation purporting to:

- Replace the existing MNAA board with a State-appointed board; and

- Transfer governance and operational control of the Airports.

However, Section 757(b)(1) of the FAA Reauthorization Act of 2024 provides that the FAA **"shall not approve"** a disputed change in airport sponsorship during the pendency of litigation unless certain conditions are met. Those conditions are not satisfied here.

### Section 757 Applies and Confers Exclusive Authority on FAA.

Section 757 expressly provides that (1) in the case of a "disputed change of airport sponsorship," the FAA Administrator "shall have the sole legal authority to approve any change" in sponsorship or operational responsibility; and (2) a "disputed change" includes any State legislative action affecting governance or operations where the airport sponsor does not consent.

The State of Tennessee has enacted legislation that would alter the governance and operational control of MNAA; and Metro Nashville and MNAA, the airport sponsor of record, have expressly withheld consent. Accordingly, the State's action

ClarkHill\M8368\498900\288520409.v1-7/1/26

constitutes a "disputed change of airport sponsorship" within the meaning of Section 757(d).

The State has attempted to assert that there is no "disputed change of airport sponsorship" because technically MNAA would remain as the name of the Airport sponsor as of July 1, 2026, and thereafter. However, this argument is specious on its face as it fails to reflect the actual language of Section 757(d), which states:

> (d)    DEFINITION OF DISPUTED CHANGE OF AIRPORT SPONSORSHIP. – In this section, the term "disputed change of airport sponsorship" means any action that seeks to change the ownership, sponsorship, **or governance of, or operational responsibility for**, a federally obligated, publicly owned airport, including any such change directed by judicial action or State or local legislative action, where the airport sponsor of record initially does not consent to such change.

(Emphasis added) Thus, the name of the "sponsor" can remain the same but the requirements and prohibitions of Section 757 apply to an attempt to change the "governance of" or "operational responsibility for" a federally funded airport such as BNA. By imposing its own board that can be fired at will without cause, the State and its new legislation are undeniably changing the "governance of" and "operational responsibility for" the Airport. This means that FAA is required to comply with Congress' clear directives in Section 757 at this time.

6

**FAA Has Mandatory Duties It Has Not Performed.**

Section 757 imposes multiple mandatory ("shall") duties on FAA:

First, FAA must exercise its sole legal authority under Section 757(a) to determine whether any change in the governance of, or operational responsibility for, the Airport sponsor may proceed.

Second, pursuant to Section 757(b)(1) FAA "shall not approve" any disputed change unless one of three conditions is satisfied: (1) written consent of the airport sponsor; (2) a final, non-reviewable judicial decision; or (3) a legally binding agreement between the parties; and none of these conditions exists here.

Third, under Section 757(c), FAA "shall independently determine": (1) whether any proposed sponsor/operator can comply with federal requirements; and (2) whether the proposed change is consistent with (a) federal law; (b) FAA regulations; (c) Grant assurances; and (d) federal land conveyance obligations.

**The May 20, 2026 Letter to FAA**

On May 20, 2026, Metro Nashville emailed FAA Chief Counsel McKenna a letter which informed FAA that Metro Nashville "disputes the change in both governance and ownership of the [Authority] as a result of the recently enacted HB2507/SB2473 (as amended) (the '2026 Act')," pursuant to which "on July 1, 2026, the current MNAA Board of Commissioners, all of whom were chosen by Metro Nashville's Mayor and approved by its Metropolitan Council, will be

7

dissolved and replaced by a board controlled by the State of Tennessee." **Exhibit 1** hereto.

The letter requested that FAA "notify the Chair of the MNAA Board of Commissioners, Nancy Sullivan, P.E., that the governance and operational responsibility of the MNAA shall not change until there is compliance with § 757 . . ., and that the FAA will continue to recognize the current MNAA board pending resolution of the disputed change of airport sponsorship."

FAA did not substantively respond to the May 20 letter. Nor has FAA stated that it will comply with Section 757. On May 29, 2026, the Assistant Chief Counsel for Airports and Environmental Law, Krystyna Bednarczyk, stated in an email to Metro Nashville that FAA was "finalizing" its position in response to the May 20 letter, and "expect[ed] to issue a letter shortly," and would "follow up next week with a status update." But no such follow up has occurred in the ensuing month.

### Pending Litigation in Tennessee Regarding the State's Attempted Takeover of MNAA

Currently pending in the U.S. District Court for the Middle District of Tennessee is a case styled *Metropolitan Government of Nashville and Davidson County v. Lee*, No. 3:26-cv-00793 (M.D. Tenn.) (the "MNAA Dispute Federal District Court Litigation"). Plaintiffs in the MNAA Dispute Federal District Court Litigation seek: (1) a declaratory judgment that State Officer Defendants cannot implement the 2026 Act in any way until such time that all legal prerequisites of

8

Section 757 of the FAA Reauthorization Act of 2024 have been satisfied; and (2) a temporary and permanent injunction preventing defendants Governor Lee, Speaker McNally, and Speaker Sexton from implementing the 2026 Act in any way until such time that all requirements under Section 757 have been satisfied.

### Petitioner's June 28, 2026 Letter to FAA

On June 28, 2026, counsel for Metro Nashville sent the Respondent FAA Administrator and several top FAA officials a letter which reiterated why FAA is foreclosed from approving the transfer and requested that FAA state it would comply with Section 757. **Exhibit 2** hereto. FAA did not respond, maintaining its silence since May 20 despite repeated requests for assurance by Metro Nashville.

### Petitioner's Motion for Administrative Stay

On June 29, 2026, Metro Nashville emailed the FAA Chief Counsel and Associate Administrator for Airports a Motion for Administrative Stay, requesting that FAA "agree not to recognize the State-appointed board members as legitimate members of the MNAA board authorized to assume operational responsibility for the Airports at least until one of the following occurs:

1) A final non-appealable judgment is issued in the BNA Dispute Federal Court District Litigation; or

2) A final, non-appealable judgment is issued by the U.S. Court of Appeals for the D.C. Circuit that the FAA has not violated its obligations under Section 757."

9

ClarkHill\M8368\498900\288520409.v1-7/1/26

**Exhibit 3** hereto, at 4. Because of the impending July 1, 2026 effective date of the State legislation, Metro Nashville requested that FAA respond by close of business on June 30, 2026. Yet FAA did not respond, continuing yet again to be silent in the face of Petitioner's request for assurance that FAA will comply with Section 757.

## The State Has Appointed Six New MNAA Board Members

On June 30, 2026, State officials affected the change in governance of, and operational responsibility for, the federal airport sponsor MNAA by appointing six new members to the newly expanded nine-member board, effective as of today, July 1, 2026. Of the six newly appointed members of the board: two were appointed by Tennessee Governor Bill Lee, two by the Speaker of the Tennessee Senate and two by the Speaker of the Tennessee House.

Even following the State's appointment of the six new MNAA board members, FAA continued its inexplicable pattern of complete silence in utter defiance of its Congressionally-mandated responsibilities.

## GROUNDS FOR RELIEF

Respondents' actions are unlawful and must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706, because they are:

1.      Contrary to law in that FAA's approval or acquiescence violates Section 757, which imposes a mandatory prohibition on approving disputed changes in airport sponsorship;

10

2.  In excess of FAA's delegated authority; and

3.  Arbitrary and capricious because FAA has failed to address Metro Nashville's submissions; provide a reasoned explanation for its failure to respond to Metro Nashville's submissions; or consider the statutory constraints imposed by Congress. In addition, FAA's failure to act where action is required constitutes reviewable agency action.

## REQUESTED RELIEF

Petitioner respectfully requests that this Court:

A.  Declare that the FAA has violated Section 757 of the FAA Reauthorization Act of 2024;

B.  Compel the FAA to issue a statement that it will not approve of or accept the State of Tennessee's transfer of governance of the MNAA at least until the Western District of Tennessee litigation is concluded;

C.  Vacate any agency actions inconsistent with Section 757; and

D.  Grant such other relief as the Court deems just and proper.

## REQUEST FOR EXPEDITED CONSIDERATION

Because the State of Tennessee already has appointed its new six members to the MNAA board, Petitioner Metro Nashville respectfully requests expedited consideration of this Petition.

11

Respectfully submitted,

*/s/ M. Roy Goldberg*
M. Roy Goldberg, Esq.
D.C. Bar 416953
D.C. Circuit Bar No. 39860
CLARK HILL PLC[2]
1001 Pennsylvania Avenue, N.W.
Suite 1300 South
Washington, DC 20004
Telephone:   (202) 552-2388
Email: rgoldberg@clarkhill.com

COUNSEL FOR PETITIONER
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY

Dated: July 1, 2026

---

[2]On July 13, 2026, the address of Clark Hill PLC's Washington, D.C. office will move to 601 13th Street, N.W., Suite 600 South, Washington, D.C. 20005.

12

# CERTIFCATE OF SERVICE

Pursuant to Rule 15(c) of the Federal Rules of Appellate Procedure, I hereby certify that I have this 1st day of July, 2026, caused to be served copies of the foregoing Petition for Review upon the following persons:

**BY EMAIL AND FIRST CLASS MAIL, RETURN RECEIPT REQUESTED:**

William ("Liam") McKenna, Esq.
Chief Counsel
FEDERAL AVIATION ADMINISTRATION
800 Independence Avenue SW
Washington, D.C. 20591
Email: William.Mckenna@faa.gov

Krystyna Bednarczyk, Esq.
Assistant Chief Counsel for Airports and Environmental Law
Office of the Chief Counsel
FEDERAL AVIATION ADMINISTRATION
800 Independence Avenue SW
Washington, D.C. 20591
Krystyna.Bednarczyk@faa.gov

Respectfully submitted,

*/s/ M. Roy Goldberg*
M. Roy Goldberg, Esq.
D.C. Bar 416953
D.C. Circuit Bar No. 39860
CLARK HILL PLC
1001 Pennsylvania Avenue, N.W.
Suite 1300 South
Washington, DC 20004
Telephone:  (202) 552-2388
Email: rgoldberg@clarkhill.com

Counsel for Petitioner

13

ClarkHill\M8368\498900\288520409.v1-7/1/26

# METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

FREDDIE O'CONNELL
MAYOR

WALLACE W. DIETZ.
DIRECTOR OF LAW

DEPARTMENT OF LAW
METROPOLITAN COURTHOUSE, SUITE 108
P.O. BOX 196300
NASHVILLE, TENNESSEE 37219-6300
(615) 862-6341 • (615) 862-6352 FAX

May 20, 2026

**VIA EMAIL**
William "Liam" McKenna
Chief Counsel
Federal Aviation Administration
800 Independence Avenue SW
Washington, D.C. 20591
liam.mckenna@faa.gov

Dear Mr. McKenna:

The Metropolitan Government of Nashville and Davidson County disputes the change in both governance and ownership of the Metro Nashville Airport Authority ("MNAA") as a result of the recently enacted HB2507/SB2473 (as amended) (the "2026 Act"). Pursuant to the 2026 Act, on July 1, 2026, the current MNAA Board of Commissioners, all of whom were chosen by Metro Nashville's Mayor and approved by its Metropolitan Council, will be dissolved and replaced by a board controlled by the State of Tennessee. This is a request that the Federal Aviation Administration ("FAA") notify the Chair of the MNAA Board of Commissioners, Nancy Sullivan, P.E., that the governance and operational responsibility of the MNAA shall not change until there is compliance with § 757 of the FAA Reauthorization Act of 2024 ("Section 757"), and that the FAA will continue to recognize the current MNAA board pending resolution of the disputed change of airport sponsorship.

Metro Nashville's original 1963 charter created a Department of Aviation responsible "for the operation, maintenance and control of the Nashville Metropolitan Airports and other airports [Metro Nashville] owned or operated." Metro Nashville Charter §§ 8.701, 8.702. In 1969, the Tennessee General Assembly passed the Metropolitan Airport Authorities Act (the "Original Act"), which enabled any city or metropolitan government with a population over 100,000 or any county including such a city to create a "metropolitan airport authority" that would be an "agency and instrumentality" of the "creating municipality." Original Act §§ 2, 3, *codified at* Tenn. Code Ann. §§ 42-4-102(a), -103(6), -104.

The Original Act was not self-executing; local governments had to opt in. First, the local governing body had to adopt a resolution for a public hearing on creating an authority. Original Act § 4, *codified at* Tenn. Code Ann. § 42-4-104(b)(1). After a public hearing, the governing body had to pass a second resolution creating the authority. Original Act § 4, *codified at* Tenn. Code Ann. § 104(c)(1). In 1970, Metro Nashville, following the mandated

{N0766332.1}

process, passed a resolution creating MNAA. Metro Nashville Resolution 70-872. Metro Nashville then contracted to transfer its Metro airports to MNAA.

Since its creation, MNAA has remained Metro Nashville's agency and instrumentality, subject to its supervision through the power of appointment and removal. Since 1970, Metro Nashville's Mayor has appointed, and the Metro Council approved, MNAA's commissioners; commissioners could also be removed for cause. Original Act § 5, *codified at* Tenn. Code Ann. § 42-4-105. Further, for purposes of financial reporting, including to the State Comptroller, MNAA is a component unit of Metro Nashville.

MNAA's success as Metro Nashville's agency and instrumentality is well documented. BNA is now classified as a Large Hub by the FAA, is a crew base for Southwest Airlines, and is presently the twenty-fourth busiest commercial service airport in the nation. Indeed, in 2025, BNA served more than 25 million passengers.

In 2023, the State passed legislation to replace the Metro Nashville-appointed board with a majority State-appointed board. At no point did the State contact the FAA for technical assistance as provided in Section 757(b)(3). Metro Nashville challenged the legislation, which was declared unconstitutional and enjoined by a three-judge panel and the Tennessee Court of Appeals. The dispute is currently pending before the Tennessee Supreme Court.

Undeterred, the General Assembly returned to this issue in April 2026 to pass the 2026 Act, fundamentally altering the Original Act. Airport authorities would no longer be agencies and instrumentalities of their creating municipalities. Instead, the 2026 Act changes the governance of Metropolitan Airport Authorities—including MNAA's—by vacating the current boards on July 1, 2026, and reconstituting them with a majority of State appointees. That change in appointment authority changes the governance of MNAA. It also converts MNAA from a component unit of the Metropolitan Government to a component unit of the State of Tennessee. Again, the State did not contact the FAA for technical assistance as provided in Section 757(b)(3).

Metro Nashville—the creating municipality of MNAA—was never consulted about the 2026 Act. It objects to the 2026 Act, as publicly evidenced by formal resolution of the Metropolitan Council dated May 19, 2026 (attached as Exhibit A, certified copy to follow). MNAA also objects to the 2026 Act, as publicly evidenced by a unanimously approved formal resolution dated May 20, 2026 (attached as Exhibit B, certified copy to follow). Metro Nashville is currently evaluating legal action to prevent implementation of the 2026 Act.

Section 757(b)(2) states that the FAA Administrator shall not approve a disputed change of airport sponsorship unless the Administrator receives one of the following:

(A) Written documentation from the airport sponsor of record consenting to the change in sponsorship or operation;

(B) Notice of a final, non-reviewable judicial decision requiring such change; or

(C) Notice of a legally-binding settlement agreement between the parties involved.

Section 757(d) defines a "disputed change of airport sponsorship" as "any action that seeks to change the ownership, sponsorship, or governance of or operational responsibility for, a federally obligated, publicly owned airport, including any such change directed by judicial action or State or local legislative action, where the airport sponsor of record initially does not consent to such change."

The clear and express terms of Section 757 are directly on point here. Neither Metro Nashville nor the MNAA has consented to this change. In fact, as evidenced by the resolutions attached hereto, both entities protest this change. The state law changes both governance and ownership of the sponsor without Metro Nashville's consent. Those facts cannot be rebutted.

Accordingly, Metro Nashville respectfully requests that the FAA notify Chair Sullivan that the governance and operational responsibility of the MNAA shall not change until there is compliance with Section 757.

We appreciate your prompt attention to this matter.

Sincerely,

Wallace W. Dietz, Director of Law
Metropolitan Government of Nashville and
Davidson County

cc: Kirk Shaffer

{N0766332.1}

3

# Exhibit A

# Metropolitan Nashville and Davidson County, TN
## Legislation
### Resolution: RS2026-1993

---

**File Number:   RS2026-1993**

A resolution denouncing the State of Tennessee's attempted hostile takeover of the Metropolitan Nashville Airport Authority.

WHEREAS, Metro Nashville's original charter created a department of aviation and made the Metropolitan Government responsible "for the operation, maintenance and control of the Nashville Metropolitan Airports and other airports owned or operated" by Metro Nashville (Metro Nashville Charter §§ 8.701, 8.702.1); and

WHEREAS, in 1969, the General Assembly passed the original Metropolitan Airport Authorities Act (the "Original Act" or "1969 Public Chapter 174"), which enabled any city or metropolitan government with a population over 100,000, or a county including such a city, to create a "metropolitan airport authority" that would be an "agency and instrumentality" of the "creating municipality" (Original Act § § 2, 3, codified at Tenn. Code Ann. §§ 42-4-102(a), -103(6), -104); and

WHEREAS, the Original Act was not self-executing; local governments had to opt in. First, the local governing body had to adopt a resolution for a public hearing on creating an authority (Id. § 4, codified at Tenn. Code Ann. § 42-4-104(b)(1)). After a public hearing, the governing body had to pass a second resolution creating the authority (Tenn. Code Ann. § 104(c)(1)); and

WHEREAS, in 1970, Metro Nashville followed the statutory process and passed a resolution creating MNAA (Resolution 70-872). Then, Metro Nashville and its' authority, the Metropolitan Nashville Airport Authority ("MNAA"), contracted to transfer ownership of the Metro Nashville airports to MNAA; and

WHEREAS, once established, Metro Nashville supervised MNAA through appointment and removal. Since 1970, Metro Nashville's Mayor has appointed, and the Metro Council has confirmed, MNAA's commissioners and could remove them for cause (Original Act § 5, codified at Tenn. Code Ann. § 42-4-105); and

WHEREAS, for financial reporting purposes, including to the Comptroller for the State of Tennessee, MNAA is a component unit of Metro Nashville; and

WHEREAS, MNAA's success as Metro Nashville's agency and instrumentality is well documented; in 2025, BNA served more than 25 million passengers; and

WHEREAS, in 2023, the State passed legislation to replace the Metro Nashville-appointed board with a majority state-appointed board; and

WHEREAS, that legislation was enjoined and declared unconstitutional by a three-judge panel and the Tennessee Court of Appeals; and

WHEREAS, in April 2026, the General Assembly passed SB2473 (as amended) (the "MNAA Change in Ownership and Governance Act" or "2026 Act") that fundamentally altered the Original Act, which had created airport authorities as agencies and instrumentalities of their creating municipalities; and

WHEREAS, the 2026 Act changes the governance of metropolitan airport authority boards, like MNAA, by vacating the current boards on July 1, 2026, and reconstituting them with majority State appointees; and

WHEREAS, that change in appointment authority converts MNAA from a component unit of the Metropolitan Government to a component unit of the State of Tennessee; and

WHEREAS, the Metropolitan Government, as the creating municipality of the MNAA, was not

---

1

File Number: *RS2026-1993*

consulted about the 2026 Act, and objects to the Act; and

WHEREAS, the 2026 Act is contrary to the wishes of the residents of Metropolitan Nashville.

NOW, THEREFORE, BE IT RESOLVED BY THE COUNCIL OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY:

Section 1. That the Metropolitan Council expresses its strong opposition to the MNAA Change in Ownership and Governance Act and reaffirms that the MNAA continues to be an agency and instrumentality of the Metropolitan Government, with a board appointed by local officials.

Section 2. That this resolution be delivered to the proper authorities at the Federal Aviation Administration.

Section 3. That this resolution shall take effect from and after its adoption, the welfare of The Metropolitan Government of Nashville and Davidson County requiring it.

**Mayor** _____    **Date** _____

Freddie O'Connell



# Metropolitan Nashville and Davidson County, TN

## Legislative History

### File Number: RS2026-1993

| | | | | | |
|---|---|---|---|---|---|
| **File ID:** RS2026-1993 | | **Type:** Resolution | | **Status:** Passed | |
| **Version:** 1 | | **Agenda Section:** | | **In Control:** Metropolitan Council | |
| | | | | **File Created:** 05/12/2026 | |
| **Subject:** | | | | **Final Action:** 05/19/2026 | |

**Caption:** A resolution denouncing the State of Tennessee's attempted hostile takeover of the Metropolitan Nashville Airport Authority.

**Agenda Date:** 05/19/2026

**Sponsors:** Capp, Spain, Welsch, Benedict, Bradford, Vo, Toombs, Evans-Segall, Gadd, Nash, Suara, Allen, Porterfield and Ewing

**Enactment Date:**

**Attachments:**

**Enactment Number:**

**LS:**

**Hearing Date:**

**Entered by:**

**Effective Date:**

**Related Files:**

## History of Legislative File

| Version: | Acting Body: | Date: | Action: | Sent To: | Due Date: | Return Date: | Result: |
|---|---|---|---|---|---|---|---|
| 1 | Metropolitan Council | 05/12/2026 | filed | | | | |
| 1 | Rules, Confirmations, and Public Elections Committee | 05/19/2026 | approved | | | | |
| 1 | Metropolitan Council | 05/19/2026 | adopted | | | | |

# Exhibit B

## MNAA RESOLUTION NO. 2026-06

**A RESOLUTION OPPOSING HB2507/SB2473**

WHEREAS, The Metropolitan Government of Nashville and Davidson County's (hereinafter "Metro Nashville") original charter created a department of aviation and made it responsible "for the operation, maintenance and control of the Nashville Metropolitan Airport and other airports owned or operated" by Metro Nashville. Metro Nashville Charter §§ 8.701, 8.702.1; and

WHEREAS, in 1969, the General Assembly passed the original Metropolitan Airport Authorities Act (the "Original Act" or "1969 Public Chapter 174"), that enabled any city or metropolitan government with a population over 100,000, or a county including such a city, to create a "metropolitan airport authority" that would be an "agency and instrumentality" of the "creating municipality." Original Act §§ 2, 3, *codified at* Tenn. Code Ann. §§ 42-4-102(a), -103(6), -104; and

WHEREAS, the Original Act was not self-executing; local governments had to opt in. First, the local governing body had to adopt a resolution for a public hearing on creating an authority. *Id.* § 4, *codified at* Tenn. Code Ann. § 42-4-104(b)(1). After a public hearing, the governing body had to pass a second resolution creating the authority. Tenn. Code Ann. § 104(c)(1); and

WHEREAS, in 1970, Metro Nashville followed the statutory process and passed a resolution creating the Metropolitan Nashville Airport Authority ("MNAA"). (Resolution 70-872.) Then, Metro Nashville and its authority, MNAA, contracted to transfer ownership of the Metro Nashville airports to MNAA; and

WHEREAS, once established, Metro Nashville was responsible for commissioner appointments and removal in accordance with the Original Act as amended over time. Since 1970, Metro Nashville's Mayor appointed, and the Metro Council approved, MNAA's commissioners and could remove them for cause. Original Act § 5, *codified at* Tenn. Code Ann. § 42-4-105; and,

WHEREAS, MNAA's success as Metro Nashville's agency and instrumentality is well documented; in 2025, BNA served more than 25 million passengers; and

WHEREAS, in 2023, the State passed legislation to replace the Metro Nashville appointed board with a majority state appointed board; and

WHEREAS, that legislation was enjoined and declared unconstitutional by a three judge panel and the Tennessee Court of Appeals; and

WHEREAS, in April 2026 the General Assembly passed HB2507/SB2473 (as amended) (the "2026 Act"); and

WHEREAS, the MNAA was not consulted about the 2026 Act and the Board of Commissioners objects to the Act.

NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF COMMISSIONERS OF THE METROPOLITAN NASHVILLE AIRPORT AUTHORITY AS FOLLOWS:

Section 1. That the Board of Commissioners of the Metropolitan Nashville Airport Authority expresses its strong opposition to the 2026 Act.

Section 2. That this Resolution be delivered to the proper authorities at the Federal Aviation Administration by the Director of Law of the Metropolitan Government of Nashville and Davidson County.

Section 3. This Resolution shall take effect from and after its adoption and be made a part of the Board of Commissioners official Minutes of Record.

RECOMMENDED:

Wallace W. Dietz

Director of Law

Metropolitan Government of Nashville

& Davidson County

ADOPTED:

Nancy B. Sullivan, Board Chair

ATTEST:

Andrew W. Byrd, Board Secretary

This 20th day of May 2026.

 **Clark Hill**

Roy Goldberg
T (202) 552-2388
F (202) 572-8687
Email:rgoldberg@clarkhill.com

Clark Hill
601 13th Street N.W.
Suite 600 South
Washington, DC 20005
T (202) 772-0909
F (202) 772-0919

June 28, 2026

**VIA EMAIL AND NEXT-DAY BY HAND DELIVERY & CERTIFIED MAIL**

The Honorable Bryan Bedford
Administrator
Federal Aviation Administration
800 Independence Avenue, S.W.
Washington, D.C. 20591
Email: bryan.bedford@faa.gov

William (Liam) McKenna, Esq.
Chief Counsel
Federal Aviation Administration
800 Independence Avenue, SW
Washington, D.C. 20591
Email: liam.mckenna@faa.gov

**COPY BY EMAIL:**

The Honorable Christopher Rocheleau
Deputy FAA Administrator
Federal Aviation Administration
800 Independence Avenue, SW
Washington, D.C. 20591
Email: chris.rocheleau@faa.gov

**COPY BY EMAIL:**

The Honorable Daniel J. Edwards
Associate Administrator for Airports
Federal Aviation Administration
800 Independence Avenue, SW
Washington, D.C. 20591
Email: daniel.edwards@faa.gov

**Re:    Nashville International Airport (BNA) – Need for Agency Compliance with Section 757 of the FAA Reauthorization Act of 2024; Notice of Intent to Seek Relief Under 5 U.S.C. § 706(1)**

Dear Administrator Bedford and Chief Counsel McKenna:

This letter is on behalf of our client, the Metropolitan Government of Nashville and Davidson County ("Metro Nashville"), which created the Metropolitan Nashville Airport Authority ("MNAA"), which in turn owns and operates, and is the federally-recognized "sponsor" of, the Nashville International Airport ("BNA" or "Airport"). Pursuant to Title 42 of the TN Code, MNAA is the agency and instrumentality of Metro Nashville while at the same time being an independent governmental entity. Metro Nashville nominates and confirms the MNAA Board of Commissioners in whom is vested all power of MNAA under Title 42.

ClarkHill\M8682\499851\288486242.v1-6/28/26



June 28, 2026
Page 2

On May 20, 2026, Metro Nashville emailed Chief Counsel McKenna a letter which informed FAA that Metro Nashville "disputes the change in both governance and ownership of the [Authority] as a result of the recently enacted HB2507/SB2473 (as amended) (the '2026 Act')," pursuant to which "on July 1, 2026, the current MNAA Board of Commissioners, all of whom were chosen by Metro Nashville's Mayor and approved by its Metropolitan Council, will be dissolved and replaced by a board controlled by the State of Tennessee." The letter requested that FAA "notify the Chair of the MNAA Board of Commissioners, Nancy Sullivan, P.E., that the governance and operational responsibility of the MNAA shall not change until there is compliance with § 757 of the FAA Reauthorization Act of 2024 ("Section 757"), and that the FAA will continue to recognize the current MNAA board pending resolution of the disputed change of airport sponsorship."

Unfortunately, 39 days have passed since that letter, and the FAA has not substantively responded to it. Nor has FAA stated that it will comply with Section 757. On May 29, 2026, the Assistant Chief Counsel for Airports and Environmental Law, Krystyna Bednarczyk, stated in an email to Metro Nashville that FAA was "finalizing" its position in response to the May 20 letter, and "expect[ed] to issue a letter shortly," and would "follow up next week with a status update." But no such follow up has occurred in the ensuing month.

The lack of responsiveness from FAA is very concerning. Time is now extremely urgent since the governance change imposed by the new Tennessee law goes into effect **in only three days**. FAA can avoid the chaos and disruption that will befall the Airport and its airlines, passengers and other stakeholders by issuing a statement at this time to signify its adherence to the statutory mandate of Section 757. Absent immediate action, Metro Nashville will be required to seek judicial relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1), "to compel agency action unlawfully withheld or unreasonably delayed," and/or 49 U.S.C. § 46110 because of the agency's noncompliance with the express directives of Section 757.

1. **Section 757 Applies and Confers Exclusive Authority on FAA.**

Section 757 expressly provides that (1) in the case of a "disputed change of airport sponsorship," the FAA Administrator "shall have the sole legal authority to approve any change" in sponsorship or operational responsibility; and (2) a "disputed change" includes any State legislative action affecting governance or operations where the airport sponsor does not consent.

Here, (1) Tennessee has enacted legislation that would alter the governance and operational control of MNAA; and (2) Metro Nashville and MNAA, the airport sponsor of record, have expressly withheld consent. Accordingly, the State's action constitutes a "disputed change of airport sponsorship" within the meaning of Section 757(d).

The State has attempted to assert that there is no "disputed change of airport sponsorship" because technically MNAA would remain as the name of the Airport sponsor as of July 1, 2026 and thereafter. However, this argument is specious on its face as it fails to reflect the actual language of Section 757(d), which states:

June 28, 2026
Page 3

> (d) DEFINITION OF DISPUTED CHANGE OF AIRPORT SPONSORSHIP. –
> In this section, the term "disputed change of airport sponsorship" means any action
> that seeks to change the ownership, sponsorship, **or governance of, or operational
> responsibility for**, a federally obligated, publicly owned airport, including any
> such change directed by judicial action or State or local legislative action, where
> the airport sponsor of record initially does not consent to such change.

(Emphasis added) Thus, the name of the "sponsor" can remain the same but the requirements and prohibitions of Section 757 apply to an attempt to change the "governance of" or "operational responsibility for" a federally funded airport such as BNA. By imposing its own board that can be fired at will without cause, the State and its new legislation are undeniably changing the "governance of" and "operational responsibility for" the Airport. This means that FAA is required to comply with Congress' clear directives in Section 757 at this time.

## 2.    FAA Has Mandatory Duties It Has Not Performed.

Section 757 imposes multiple mandatory ("shall") duties on FAA:

First, FAA must exercise its sole legal authority under Section 757(a) to determine whether any change in the governance of, or operational responsibility for, the Airport sponsor may proceed.

Second, pursuant to Section 757(b)(1) FAA "shall not approve" any disputed change unless one of three conditions is satisfied: (1) written consent of the airport sponsor; (2) a final, non-reviewable judicial decision; or (3) a legally binding agreement between the parties; and none of these conditions exists here.

Third, under Section 757(c), FAA "shall independently determine": (1) whether any proposed sponsor/operator can comply with federal requirements; and (2) whether the proposed change is consistent with (a) federal law; (b) FAA regulations; (c) Grant assurances; and (d) federal land conveyance obligations.

## 3.    Litigation is Now Pending Regarding the BNA Dispute.

Section 757(b)(2) makes it clear that FAA "may not evaluate or approve" a disputed change while litigation is pending. On June 10, 2026, Metro Nashville and MNAA initiated litigation challenging the State's action. *Metropolitan Government of Nashville and Davidson County and Metropolitan Nashville Airport Authority v. Bill Lee*, Case No. 3:26-cv-00793 (M.D. Tenn.) (Campbell, J) (the "BNA Dispute Federal Court District Litigation"). The Complaint in the BNA Dispute Federal District Court Litigation alleges, among other things:

> 67. Section 1 of the Act vacates the MNAA board of commissioners on July 1,
> 2026. In so doing, the Act will remove all current commissioners, who were
> appointed by the Metro Nashville mayor and confirmed by the Metro Nashville
> council, from office and abridge their terms.

June 28, 2026
Page 4

68. Section 1 creates a new nine-member board of commissioners that will be vested with legal authority over governance of the MNAA on July 1, 2026.

69. State Officer Defendants will appoint a majority of the new MNAA Board. The 2026 Act authorizes the Speaker of the State House of Representatives, the Speaker of the State Senate, and the Governor each to appoint two members to the MNAA board of commissioners. It authorizes Metro Nashville's Mayor to appoint three members to the board. Unlike the board vacated by the 2026 Act, any member of the new MNAA Board can be removed without cause or oversight by his or her respective appointing authority.

70. This is a State power grab. Where previously the MNAA was controlled by commissioners appointed by Metro Nashville and removable only for cause, the new Authority will be controlled by members appointed by the State of Tennessee who can be removed at any time without cause.

71. Metro Nashville—the creating municipality of the MNAA—was never consulted by the Act's sponsors, other legislative leadership, or the State's executive branch about the 2026 Act.

72. On May 19, 2026, the same day the Governor signed the Act, Metro Nashville's Metropolitan Council passed RS2026-1993, a resolution expressing "its strong opposition" to the Act and the State of Tennessee's attempted takeover of the MNAA (attached as Exhibit 8).

73. On May 20, 2026, the MNAA unanimously passed a resolution expressing "its strong opposition" to the State's attempted takeover of the MNAA.

74. The 2026 Act's vacating of the Metro Nashville-appointed board and its enabling of a new form of airport authority board controlled by State Officer Defendants constitutes a disputed change in the sponsorship of the Airport.

75. The 2026 Act also changes ownership of the MNAA. Because state officials will appoint a voting majority to the MNAA board and have unfettered dismissal powers, generally accepted accounting principles require that MNAA be considered a component unit of state government that must be reported on the State's financial statements rather than Metro Nashville's.

76. Because the 2026 Act extinguishes Metro Nashville's appointment authority and oversight over MNAA and establishes a board controlled by the State Defendants, the 2026 Act implements a change in governance of the Nashville Airport Authority.

77. By vacating the existing locally appointed MNAA board of commissioners and installing a new State Officer-controlled board on July 1, 2026, the 2026 Act effects a change in the operational responsibility for the Airport.

June 28, 2026
Page 5

The Complaint further asserts that "Section 757 of the Reauthorization Act protects Metro Nashville and the MNAA from the State's vacating its board of commissioners and assuming governance, ownership, sponsorship, or operational responsibility for the airport until any disputed change is resolved and the FAA administrative process is completed," and that "Congress's expressed intent under Section 757 was for state and local governmental entities to resolve 'disputed changes' through judicial proceedings or by agreement before seeking the administrative approval necessary to implement changes to the ownership, sponsorship, governance, or operational responsibility for federally obligated, publicly-owned airports." ¶¶ 91-92.

Plaintiffs in the BNA Dispute Federal District Court Litigation seek: (1) a declaratory judgment that State Officer Defendants cannot implement the 2026 Act in any way until such time that all legal prerequisites of Section 757 of the FAA Reauthorization Act of 2024 have been satisfied; and (2) a temporary and permanent injunction preventing Defendants Governor Lee, Speaker McNally, and Speaker Sexton from implementing the 2026 Act in any way until such time that all requirements under Section 757 of the FAA Reauthorization Act of 2024 have been satisfied.

On June 26, 2026, the Magistrate assigned to the case granted Defendants' motion to have until August 3, 2026 to respond to the Complaint in the BNA Dispute Federal District Court Litigation. ECF No. 24. Clearly, the case is ongoing and therefore, Section 757(b)(2) fully applies and requires FAA to "not evaluate or approve" the State's attempt to take over control of the Airport.

### 4.    FAA's Failure to Act Violates the APA as Well as Section 757.

Despite the clear statutory mandates in Section 757, FAA has failed to:

(1)    Formally recognize and process the State's action as a disputed change under Section 757;

(2)    Exercise its exclusive approval authority;

(3)    Make the independent determinations required by Section 7575(c); or

(4)    Take action to ensure that an unlawful governance change does not proceed.

Because Section 757 repeatedly uses mandatory language ("shall"), FAA's obligations are nondiscretionary. Its failure to act therefore constitutes agency action unlawfully withheld under 5 U.S.C. § 706(1) (the "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed"). In short, FAA's refusal to state its compliance with Section 757 constitutes agency action "unlawfully withheld" and "unreasonably delayed."

Even if FAA asserts discretion as to timing (which Metro Nashville does not concede), the delay is independently unlawful given: (1) the active implementation of State legislation; (2) the statutory exclusivity of FAA approval authority; (3) the risk that a governance change could occur

June 28, 2026
Page 6

without federal authorization; and (4) the resulting irreparable harm to federal aviation interests and grant compliance.

Section 757 establishes a federal gatekeeping regime: (1) no disputed governance change may occur without FAA involvement; and (2) the State cannot lawfully bypass FAA's exclusive authority. FAA's failure to act therefore risks: (1) allowing an unauthorized and federally noncompliant change to occur; (2) undermining federal oversight of federally obligated airports; and (3) jeopardizing compliance with grant assurances and federal funding conditions.

The lack of an FAA decision in response to Metro Nashville's request does not preclude judicial review of the agency's failure to act. Courts can insure that statutory rights are not denied by agency inaction, under both general equitable powers and powers granted under the APA. *Seatrain Intern., S.A. v. Federal Maritime Commission*, 598 F.2d 289 (D.C. Cir. 1979). "It is obvious that the benefits of agency expertise and creation of a record will not be realized if the agency never takes action." *Telecomm. Research and Action Center ("TRAC") v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984); *id.* ("there is no doubt that this court has present jurisdiction to hear claims concerning nonfinal agency action (or inaction)"). And a clear refusal by a federal agency to act can constitute a final order under the circumstances, especially where, as here, an answer to the question was promised but not provided.

Moreover, regardless of the number of days, an agency delay is unreasonable and contrary to 5 U.S.C. § 701(6) where, as here, "Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute." *TRAC*, at 80); *PCHRG v. FDA*, 740 F.2d 21, 34-35 (D.C. Cir. 1984). The court also must "take into account the nature and extent of the interests prejudiced by delay." *TRAC*, at 80; *PCHRG*, at 35. In addition, the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'" *Id.* at 34. "If, after studying the statute and its legislative history, the court determines that the defendant official has failed to discharge a duty which Congress intended him to perform, the court *should* compel performance, thus effectuating the congressional purpose." *Estate of Smith v. Heckler,* 747 F.2d 583, 591 (10th Cir. 1984).

Alternatively, if FAA allows the governance of - and operating responsibility for - the Airport to transfer from Metro Nashville to the State of Tennessee, it will constitute a final order under 49 U.S.C. § 46110 that on its face is contrary to the requirements of Section 757 and otherwise arbitrary and capricious, an abuse of discretion and contrary to law. There is no evidence that FAA has satisfied its mandatory requirements in Section 757(b)(1) and (c) before it can approve any such transfer.

If despite of all the above, FAA has already rendered a decision to affirm the transfer of the Airport to the State of Tennessee, we ask that FAA notify Metro Nashville of that immediately so that the impending litigation can reflect that state of the agency record.

5.      **Failure to Comply with Section 757 Will Cause Irreparable Harm.**

The FAA's failure to comply with its statutory obligation under Section 757 threatens to cause irreparable harm if FAA does not take corrective action immediately. Attached hereto is the

June 28, 2026
Page 7

Declaration of Kirk Shaffer (June 9, 2026), which was filed in the BNA Dispute Federal District Court Litigation. Mr. Shaffer was the FAA Associate Administrator for Airports in two separate administrations, and his serving as the General Counsel of MNAA for almost 20 years provides him with very relevant knowledge of the Airport's operations, relationships, obligations, and programs. If the State is successful in its effort to displace the current governance of the Airport as early as July 1, 2026, it will, among other things:

- Generate immediate conflict and confusion over who has authority to approve/sign contracts, oversee major construction projects, and coordinate/interface with air carriers, other major stakeholders, and the FAA;

- Upend MNAA's $3 billion development plan by inserting politicians rather than trained, experienced airport professionals into the budgetary and capital development plan process; and

- Immediately harm BNA goodwill and its reputation that the Airport has spent years to develop with airlines and other numerous other high-dollar stakeholders.

¶¶ 19-20.

In light of the above and the urgency of the situation, Metro Nashville respectfully demands that FAA immediately take the following actions:

1. Confirm in writing that the Tennessee legislation constitutes a "disputed change of airport sponsorship" under Section 757(d);

2. Acknowledge FAA's exclusive approval authority under Section 757(a);

3. Delay initiating and conducting the required review and determinations under Section 757(b) and (c) until after the prerequisites in Section 757(b) (1) and (2) are satisfied;

4. Confirm that no change in governance of the Airport sponsor may take effect unless and until the statutory conditions in Section 757(b)(1) are satisfied; and

5. Take all necessary steps to ensure compliance with Section 757, including preventing implementation of any noncompliant governance change.


5.    **Notice of Intent to Seek Judicial Relief.**

If FAA fails to act promptly, Metro Nashville will be required seek relief in federal court on an emergency basis, including: (1) an order compelling FAA to perform its statutory duties under 5 U.S.C. § 706(1); (2) declaratory relief confirming FAA's obligations under Section 757; (3) injunctive relief to prevent implementation of any governance change absent FAA compliance; and (4) expedited review given the time-sensitive nature of the dispute.


ClarkHill\M8682\499851\288486242.v1-6/28/26

June 28, 2026
Page 8

Metro Nashville expressly reserves all rights, claims, and remedies. Its strong hope is that the FAA will now comply with its obligations under Section 757.

Sincerely,

CLARK HILL

*Roy Goldberg*

Roy Goldberg
COUNSEL FOR
METROPOLITAN GOVERNMENT OF
NASHVILLE & DAVIDSON COUNTY[1]

ENCLOSURE (DECLARATION OF D. KIRK SHAFFER)

**ADDIITONAL COPY RECIPIENTS:**

Wallace D. Dietz, Esq.
Director of Law
METROPOLITAN GOVERNMENT OF NASHVILLE
& DAVIDSON COUNTY

Robert E. Cooper, Jr., Esq.
BASS, BERRY & SIMS, PLC
Bob.cooper@bassbery.com
Jeffrey P. Yarbro, Esq.
BASS, BERRY & SIMS, PLC
jyarbro@bassberry.com
COUNSEL FOR METROPOLITAN GOVERNMENT OF NASHVILLE
& DAVIDSON COUNTY

D. Kirk Shaffer, Esq.
D. KIRK SHAFFER PLLC
CONSULTANT TO THE METROPOLITAN GOVERNMENT OF NASHVILLE
& DAVIDSON COUNTY

---

[1]The Clark Hill D.C. office is currently 1001 Pennsylvania Avenue, N.W., Suite 1300 S (2004) but will change to 601 13th Street, N.W., Suite 600 S (2005) on July 13, 2026.

June 28, 2026
Page 9

Phillip F. Cramer, Esq.
W. Campbell Haynes, Esq.
SPERLING KENNY NACHWALTER LLC
pcramer@sperlingkenny.com
chaynes@sperlingkenny.com
COUNSEL FOR METROPOLITAN NASHVILLE AIRPORT AUTHORITY

Gregory Zerzan, Esq.
General Counsel
U.S. DEPARTMENT OF TRANSPORTATION
Gregory.zerzan@dot.gov

Krystyna Bednarczyk, Esq.
Assistant Chief Counsel for Airports and Environmental Law
FEDERAL AVIATION ADMINISTRATION
Krystyna.Bednarczyk@faa.gov

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |
|---|---|
| THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE and the METROPOLITAN NASHVILLE AIRPORT AUTHORITY,<br><br>Plaintiffs,<br><br>v.<br><br>BILL LEE, in his official capacity as Governor of the State of Tennessee; RANDY McNALLY, in his official capacity as Speaker of the Senate of the State of Tennessee; and CAMERON SEXTON, in his official capacity as Speaker of the House of Representatives of the State of Tennessee,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No.: _____ |

---

## DECLARATION OF D. KIRK SHAFFER

---

I, D. Kirk Shaffer, under the penalty of perjury, declare as true and correct the following:

1.     I offer this testimony in connection with 2026 Tennessee Public Acts chap. 978 (hereinafter, the "2026 Act").

2.     From 1986 to 2004, I served variously and simultaneously as Executive Assistant to the President, Director of Properties, and General Counsel of the Metropolitan Nashville

Airport Authority (MNAA). For fourteen years, my office, my assistant, and my files were at the airport during a period of tremendous growth and change, a time when projects previously unheard of at the Nashville Airport were being built bigger and faster and at greater cost than ever before. As MNAA's outside counsel (and in less than 90 days its #2 staff member), it was my job to make these projects happen while simultaneously ensuring they were legal.

3.      In 2007, President George W. Bush appointed me to serve as Associate Administrator for Airports at the Federal Aviation Administration (FAA), leading the FAA office that regulates the national airport system, including Nashville International Airport (BNA) and John C. Tune Airport (JWN), and oversees federal grant funding for airports through the Airport Improvement Program and other programs. I left the FAA to return to the private practice of law at the end of the Bush Administration.

4.      In 2018, President Donald J. Trump appointed me to serve again in the same position at the FAA. My responsibilities as Associate Administrator for Airports included: administering national airport safety standards, planning, engineering, financial assistance, and compliance for over 3,000 public-use airports nationwide.   Pursuant to my compliance responsibilities, I was the FAA's Final Agency Decisionmaker.   My decisions were directly appealable to various federal circuit courts of appeal.   Sixteen of my decisions were appealed; none were overturned.   Additional information concerning my education and experience is provided in Exhibit A attached hereto.

5.      The MNAA was created in 1970 by the Metropolitan Government of Nashville and Davidson County (Metro Nashville) pursuant to an enabling statute enacted in 1969.   As such, MNAA is the agency and operating instrumentality of the Metro Government.   From its

inception, MNAA has been directed by its statutorily prescribed Board of Commissioners (the "Board"). The Board has always been composed of a bipartisan group of business, legal, finance, and civic leaders who met qualifications stated in the enabling statute, and it has functioned in a very successful, business-like fashion, separated from partisan politics. Each member serves a seven-year term. For fifty-six years, the mayor of Nashville has appointed members to serve on the Board, subject to the approval of the Metropolitan Council. The Council's approval authority was no rubber stamp, as at least one nominee was not confirmed by the Council. Had any Commissioner committed some act or omission constituting cause for his or her removal from office, that Commissioner would have been entitled to notice from the Mayor, assured of due process including a hearing, and removed only upon a two-thirds vote of the Council.

6.     During my tenure at MNAA, among other responsibilities, I was tasked with:

a.     Negotiating long-term airline use and lease agreements with the air carrier airlines then serving Nashville, including moving overnight from the old terminal on Briley Parkway to the new terminal on Donelson Pike without service interruption.

b.     Negotiating contracts with rental car companies, food and beverage providers, news and general merchandise concessionaires, and other service providers for the new terminal.

c.     Negotiating an agreement with the State of Tennessee for the partial relocation of Donelson Pike to enable surface and structural parking in front of the new terminal.

d.     Negotiating an agreement in the early 1990s with the State of Tennessee that enabled MNAA to relocate and extend Runway 2C/20C over Murfreesboro Road.

7.     The stated justification for the 2026 Act is that 70% of the passengers come from outside Davidson County. This is far from a new development. Even in the mid-80s when I first began representing the Authority, the airport's catchment area extended well into southern Kentucky and northern Alabama. The success for which the Authority is most known has occurred since then and includes the American Airlines hub; the development of the airfield to its present state; becoming the tenth largest Southwest Airlines operation in the nation; initial development, redevelopment, and expansion of the passenger terminal to its present state; and designation as a crew base for Southwest Airlines. This only serves to demonstrate how well the MNAA Board has performed.

8.     There is no present suggestion that the Board could perform better under the proposed legislation. For decades, all passengers at BNA have been exceptionally well-served. The passenger count at BNA continues to grow and now exceeds 25,000,000 passengers per year, and BNA is now classified as a Large Hub by the FAA. Out of approximately 520 Part 139 airports in the US (those with scheduled air carrier passenger service requiring additional safety and security protections), only thirty-one are Large Hubs. BNA is presently twenty-eighth in the nation. A Large Hub is one which handles 1% or more of all passenger traffic in the nation in a year.

9.     At the same time, MNAA is presently embarked on its latest capital improvement programs, valued at over $3 billion and involving complex financing via airport revenue bonds and the support of air carrier airlines serving Nashville and its region. This program is designed to meet ever-increasing passenger demand, improve ground side access, expand terminal facilities and services, and expand the airfield. It is a highly complex project that commands the

short-term and long-term attention to detail of a large number of accredited airport executives and managers under the strategic guidance of a statutorily qualified Board of Commissioners equipped to set a bold vision and make hard, well-informed decisions without hesitation.

10.     The 2026 Act, however, terminates the existing Board and appointment and removal procedures as of July 1, 2026, and it replaces them immediately with a new governance structure in which state officials appoint six out of nine positions and can unilaterally remove those Commissioners without cause. It is my understanding, based on my own experience and having reviewed the detailed analysis of other experts in the field, that this transfer of control will result in MNAA becoming a component unit of the State of Tennessee, with ramifications for ownership, control, and financial accountability of BNA and JWN that have not been fully vetted at the local, state, or federal level.

11.     MNAA is on the eve of having two competing Boards—one mayor-appointed and Council-confirmed, the other State-appointed—both purporting to represent MNAA. Absent judicial intervention to clarify who controls MNAA and who is responsible for the fulfillment of MNAA's very substantial federal obligations, the FAA could withhold any grant awards, including infrastructure grants, from MNAA until the dispute is resolved.

12.     This expectation is based not only on my personal experience as the FAA Associate Administrator for Airports, but also on the FAA's prior declared policy about disputed changes in an airport's governance structure:

> The FAA's obligation extends to reviewing sponsor/operator eligibility when state and local governments propose a change in the airport governance structure to ensure that there is no ambiguity regarding responsibility for Federal obligations and that any proposed changes will not impact compliance with Federal law. (In the event of a local or state dispute regarding sponsorship/operation of the airport,

the FAA will apply the policy set out in Section IV below.) If any proposed changes give rise to such concerns by the FAA, the agency will work with state and/or local government(s) to resolve the concerns or, if the concerns cannot be addressed, deny the request.

Policy on Evaluating Disputed Changes of Sponsorship at Federally Obligated Airports, 81 Fed. Reg. 36144 (June 6, 2016). This policy's application to changes in airport sponsorship or governance fell squarely within the compliance authority I exercised as Associate Administrator for Airports and in my management of the Office of Airport Compliance and Management Analysis from 2018 to 2021. This Policy remained in effect throughout my second tenure at the Administration and was reaffirmed and elaborated through the issuance of formal guidance before its codification by Congress in the 2024 Reauthorization Act. *See* Compliance Guidance Letter 2021-I, Guidance for Transfer of Federally Obligated Airports (Jul. 28, 2021). Some discretion afforded to the FAA by the 2016 Policy, such as the authority to rely on legal determinations other than the parties' agreement and a final judicial decision were not included in the codification.

13.    Any airport that receives funding from the FAA (including BNA and JWN) must agree to FAA regulation. This oversight extends to every aspect of operating an airport, including:

a.    Air Traffic Control: The FAA provides air traffic control services for the world's largest and busiest airspace.

b.    Airport Planning and Capacity: Airport planning encompasses capacity, master and regional planning, aviation forecasting, and airspace planning.

c.    Airport Design: The FAA develops engineering, design, and construction standards for civil airports, heliports, and seaplane bases.

d.    Incident Investigation: The Office of Accident Investigation and Prevention is the principal organization within FAA with respect to aircraft accident investigation and all activities related to the National Transportation Safety Board (NTSB).

e.    Aircraft Certification: The Federal Aviation Administration's (FAA) Aircraft Certification Service (AIR) is part of the Office of Aviation Safety (AVS) and includes more than 1,400 engineers, scientists, inspectors, test pilots and other experts responsible for oversight of design, production, airworthiness certification, and continued airworthiness programs for all U.S. civil aviation products and foreign import products.

f.    Funding Airports through the Airports and Airways Trust Fund (AATF). Established in 1970, the Airport and Airway Trust Fund, also known as the Aviation Trust Fund, helps finance the Federal Aviation Administration's (FAA) investments in the airport and airway system, such as construction and safety improvements at airports and technological upgrades to the air traffic control system, as well as FAA operations, including providing air traffic control, overseeing commercial space launches, and conducting safety inspections. Currently, the Trust Fund may cover both capital and operating costs. In FY 2025, it provided all of the funding for two of FAA's four accounts, including the Facilities and Equipment (F&E) account and the Research, Engineering, and Development (RE&D) account. As Associate Administrator for

Airports, I was responsible for the billions of trust fund dollars dedicated to airport infrastructure funding at the federal level.

g.     Airports Capital Improvement Plan. The national Airports Capital Improvement Plan (ACIP) is an internal FAA document that serves as the primary planning tool for identifying and prioritizing critical airport development and associated capital needs for the National Airspace System. It also serves as one tool for evaluating the distribution of grant funds under the Airport Improvement Program (AIP).

h.     Airports Improvement Program. The Airport Improvement Program (AIP) provides grants to public agencies for the planning and development of public-use airports that are included in the National Plan of Integrated Airport Systems (NPIAS).

14.     The FAA's key mechanism to ensure airport compliance with the countless federal requirements that help maintain a consistent set of airport conditions across the thousands of airports in our system is a set of forty FAA airport sponsor grant assurances. Each of the grant assurances is derived directly, often verbatim, from federal statute. The grant assurances also incorporate a large number of federal statutes, regulations, executive orders, and policies by direct reference. Each time an airport receives a grant from the FAA, the airport sponsor executes a contract which contains the grant assurances, and the sponsor's legal counsel independently certifies the sponsor's authority and ability to fulfill the assurances.

15.     If an airport fails to comply with grant assurances and does not immediately correct its non-compliance to the FAA's satisfaction, one of the tools available to the FAA and specifically to the Associate Administrator for Airports is, depending on the severity of the non-compliance, to:

a.  Suspend the airport's eligibility for future FAA grants;

b.  Stop payment on presently approved grants; and/or

c.  "Claw back" the proceeds of closed grants for up to six years.

16.  More than one of the FAA airport sponsor grant assurances directly impacts an airport sponsor's rights and powers, especially those pertaining to governing/operating its airport. As with all other grant assurances, Metro Nashville and MNAA must follow those rights and power assurances. That is why Section 757 of the FAA's 2024 Reauthorization Act is so important and must be obeyed. On the one hand, the FAA alone has the authority to approve the sponsor of a federally obligated airport and has established a detailed procedure for evaluating a prospective sponsor; on the other hand, the airport is a local asset, and the designation of a proposed sponsor belongs in the local community. When disputes arise over sponsorship, as in the current case and in North Carolina, Georgia, and Mississippi over the past several years, the FAA will not intervene and resolve their dispute. That is a local matter.

17.  Thus, if, as in this case, there is dispute over who will be the sponsor for BNA and JWN, the FAA Administrator is barred by federal statute—Section 757—from even evaluating a proposed new sponsor until the parties agree on a new sponsor; the incumbent sponsor consents to the proposed new sponsor; or, in the event of litigation, there is a final, non-appealable order from a court of competent jurisdiction resolving the dispute. As both Metro Nashville and MNAA have unanimously passed Resolutions opposing the 2026 Act and correctly served those documents on the FAA Administrator, the Administrator is without authority to even assess the qualifications of any Board which officials of the State of Tennessee may propose or appoint.

Thus, if the State officials forge forward, any number of adverse impacts will be suffered by BNA and JWN.

18.     Further, where there is a change in sponsorship, the proposed sponsor must also submit a Part 139 airport operator certificate. The FAA Act requires any person who would operate an airport to be certified, and these certificates are not transferable. This is essential to providing safe, uninterrupted service at the nation's airports.

19.     In my experience, the 2026 Act threatens the orderly operation of BNA and JWN in a number or ways, including by:

    a.     Infringing on Metro Nashville's sovereignty and removing its ability to appoint and confirm commissioners, while adhering to clear, statutory qualifications standards.

    b.     Generating immediate conflict and confusion over who has authority to approve/sign contracts, oversee major construction projects, and coordinate/interface with air carrier airlines, other major stakeholders, and the Federal Aviation Administration and other regulatory bodies.

    c.     Upending MNAA's $3 billion development plan by inserting politicians rather than trained, experienced airport professionals into the budgetary and capital development plan process.

    d.     Harming BNA goodwill. A key to the success of Nashville International Airport, for example, is the goodwill it has developed over decades for its stability; fair dealing with its aviation partners; and focus on a positive experience for the traveling public. Harm to BNA's goodwill cannot be measured in dollars.

c.    Harming BNA reputation. Another key to the success of Nashville International Airport is its reputation for bold, forward thinking; decisive and business-based action alongside its aviation stakeholders; creativity in financing multi-billion-dollar, long-term projects with support in the financial markets; and strong relationships with federal regulators.  A reputation also cannot be valued in dollars.

20.    Furthermore, based on my experience and understanding of the 2026 Act:

a.    Harm is imminent, commencing July 1, 2026.

b.    Harm is unique as Nashville International Airport is the only air carrier airport in Middle Tennessee, and its economic impact on the region cannot be placed at risk.

c.    Harm is actual and likely to occur, as the success of Nashville International Airport over decades is built upon relationships and trust with air carrier airlines and numerous other high-dollar stakeholders who have a voice, based upon long-term contractual obligations, in approving airport development projects, budgets, and rates and charges.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this _9th_ day of June 2026.

D. Kirk Shaffer

# EXHIBIT A

D. Kirk Shaffer, C.M.
4790 Old Dominion Drive, Arlington, Virginia 22207
Telephone: 615-587-4242 Email: kirk@dkirkshaffer.com

## Professional Profile

**Leader with almost 40-year record of success providing strategic vision and counsel as an entrepreneurial airport executive, advocate, and regulator. "Go to" business adviser to the world's largest airline, rental car company, aviation trade association, helicopter trade association, defense contractor, airport retail concessionaire, private hospital operator, and airports nationwide, from large hubs to designated relievers. Expert at establishing and exceeding business performance goals and objectives (profit, nonprofit, and governmental), building highly effective and collaborative teams, providing substantive advice on technical and policy issues, and inspiring people in highly performing organizations. Two-time Presidential appointee at the Federal Aviation Administration (FAA), managing the systematic and political issues driving domestic and international civil aviation as they relate to airports. Recognized for innovative and adaptive leadership of national organizations to surpass goals and expectations. Plain-spoken, engaging, authoritative communicator. Well-known for identifying and promoting diverse human talent. Expert at identifying strategic issues, formulating policies to address them, and building consensus amongst aviation stakeholders with competing priorities to successfully implement industry change. Broadly experienced with Congressional testimony and effectively interacting with other senior executives, elected officials, and the media.**

**Significant Aviation Accomplishments**

**Principal**                                                          **2022 to present**
**D. Kirk Shaffer, PLLC, Washington, DC**

- Expert witness successfully supporting an aviation stakeholder in the Top 50 of the Forbes 400 Wealthiest People in the US in preventing the illegal closure of a regionally important general aviation airport: *East End Hangars, Inc., et al. v. Town of East Hampton, New York* in the Supreme Court of the State of New York, Part XXXVI, Suffolk County, Index 602799/2022
- Expert witness successfully supporting a regionally important general aviation airport in federal litigation and before the Federal Aviation Administration: *Joliet Avionics, Inc. v. Luminair, Inc. and City of Aurora* in the United States District Court for the Northern District of Illinois, Eastern Division, No. 19 - CV - 08507 and yet undocketed action pursuant to Title 14 CFR Part 16 before the FAA
- Expert witness successfully supporting the Nashville, Tennessee, city government in challenging unconstitutional takeover legislation passed by the Tennessee Legislature: *The Metropolitan Government of Nashville and Davidson County v. Bill Lee, Governor of Tennessee, et al, and the Metropolitan Nashville Airport Authority* in the Chancery Court for the State of Tennessee, Twentieth Judicial District, Davidson County, No. 23 - 0778 - II
- National counsel to MiillionAir, Inc. and American Jet International, Inc. at several of its fixed base operations in the US
- Expert witness successfully supporting a thriving fixed base operation in state court and before the Federal Aviation Administration in requiring the FAA to bring a federally-obligated airport sponsor into grant assurance compliance against the best efforts of a powerful local

newcomer to the airport industry: *ProJet Aviation, LLC v. Town of Leesburg, et al* in the Circuit Court for Loudon County, Virginia, No. CL 22003512 - 00, and before the FAA pursuant to Title 14 CFR Part 13
- Strategic advisor to the private owner of a large general aviation airport in the nation's busiest, most complex, most congested airspace with a view toward infrastructure expansion, environmental remediation, and multi-modal leadership

**Senior Advisor to the Assistant Administrator**        **January 2021 to January 2022**
      **for Civil Rights**
**Federal Aviation Administration, Washington, DC**

- Establishing closer relationships between the Office of Civil Rights and federally-obligated airport sponsors across the US system
- Broadening the understanding of airport sponsors' civil rights obligations
- Enhancing the implementation of the Disadvantaged Business Enterprise and Airport Concessions Disadvantaged Business Enterprise Programs

**Associate Administrator for Airports (Presidential Appointment)**    **2007-2009, 2018-2021**
**Federal Aviation Administration, Washington, DC**

- Member of FAA executive leadership reporting directly to FAA Administrator and US Secretary of Transportation
- Only two-time Associate Administrator for Airports in FAA history
- Received Distinguished Service Award from Secretary Elaine Chao for leading the FAA response to the COVID-19 national emergency
- Led the invention of the CARES Act airport grant program in only 18 calendar days after statutory enactment and commenced disbursing $15 billion in airport grants across the nation, an increase of 447% in financial support over any prior year
- Set the previously unheard of pace for the deployment of CARES Act airport grants and increased the production of individual grants by 906% (77 grants per day v. 8.5 grants per day)
- Continuously administered the multi-billion dollar Airport Improvement Program, Letter of Intent Financing Program, and Passenger Facility Charge Program supporting over 3,300 airports systemwide while achieving no adverse audit findings from the General Accounting Office
- Authored a precedent-setting decision finding the largest, most complex airport sponsor in the system in violation of airport revenue diversion statutes and financial transparency requirements
- Continued to drive authority and responsibility down through the organization to the 22 Airports District Office Managers across the system while setting the example of being Fast, Accurate, Comprehensive, Concise, and Candid
- Accelerated the digital transformation of many of our essential programs (AIP grants, Airport Master Record data, Airport Certification Manuals, Airport Layout Plans, etc.) during a national emergency
- Insured the personal well-being and continued outstanding performance of the Airports Team while transitioning to full telework in 8 calendar days, notwithstanding the added burdens of closed schools and childcare facilities, restricted access to vital records and reference materials, suspended official travel, at risk family members, and short supplies of essential materials

- Managed the real-time response to over 500 CARES Act inquiries to wide-ranging stakeholders including Members of Congress, Governors, and local elected officials nationwide
- Insured the safety of over 2,000 aircraft unexpectedly parked on runways and taxiways of 113 airports across the country at the onset of the COVID-19 national emergency
- Led 560+ employees in 22 offices nationwide and managed an annual operating budget of $116 million
- Completed the nation's first One Federal Decision aviation project —the LaGuardia AirTrain— while cutting the regulatory burden and environmental processing schedule down to 2 years from a national average of 41/2 years
- Refocused and motivated our Compliance Team, subject to intense external political and legal pressure, on achieving substantial rather than incremental progress toward achieving strict airport revenue use compliance by airport sponsors across the system
- Broke a years-long bureaucratic logjam at the state and local level to achieve a permanent agreement which will insure that the construction of the Jefferson Parkway around the City of Denver does not impair the Runway Protection Zones at Rocky Mountain Metro Airport
- Broke another years-long bureaucratic logjam to approve a new regional airport for Thomasville, Alabama
- Recruited a talented, highly experienced executive to substantially enhance the Airports Organization's standing in Safety Management Systems, Cybersecurity, and Commercial Space Transportation
- Responsible for the safety, planning, financing, design standards, performance, and statutory compliance of thousands of airports nationwide
- Responsible for certification, inspection, and safety compliance of 528 Part 139 commercial service airports
- Repeatedly produced the National Plan of Integrated Airports Systems, the basis for Congressional appropriations for over 3,200 airports nationwide
- Routinely testified before Congress, its professional staff, state and local elected officials, and aviation industry groups and provided voluminous, detailed technical assistance to Congressional authorizers and appropriators on a constant basis
- Received FAA Award for Excellence for leading a team of certification safety inspectors in assessing the condition and international compliance of numerous airports in Iraq
- Received the DOT Team Award from Secretary Mary Peters for co-chairing the National Task Force on Customer Service During Irregular Operations and avoiding a federal regulation which would have been an unfunded federal mandate on airports and airlines
- Instrumental in developing and executing the FAA's Flight Plan 2008-2012 and Flight Plan 2009-2013
- Concluded and implemented the US's first Aviation Cooperation Program with the Government of India
- Published over 300 Wide Area Augmentation System approaches in one year benefitting airport of all sizes
- Achieved 99.8% sustained operational availability (the highest possible) for the 35 largest airports in the US system
- Complete a record seven Engineered Material Arresting Systems (EMAS) in one year
- Upgraded forty critical Runway Safety Areas in one year, exceeding a Congressional mandate, by identifying new ways to expedite environmental impact statements, approve more forward-looking means of financing, and overcome neighborhood opposition in 2008
- Commissioned three air carrier runways (IAD, ORD, SEA) in one day, a national first in 2008

- Delivered nine additional runway/taxiway projects to increase the annual service volume at the nation's 35 largest airports by over 1% in one year
- Reduced runway incursions caused by vehicle/pedestrian deviations by 16+% in one year through the development of Enhanced Taxiway Centerline Markings
- Achieved a rating of "no deficiencies" in the International Civil Aviation Organization Universal Safety Oversight Audit Program
- Expedited the deployment of Airport Surface Detection Equipment - Model X and tripled the number of installations at major airports in one year
- Authored a record annual number of decisions pursuant to 14 CFR Part 16, all of which were upheld in federal circuit courts of appeal

**Additional Professional Experience and Accomplishments**

**Principal**                                                                                     **2013 to 2018**
**D. Kirk Shaffer, PLLC, Washington, DC**

- Expert Witness: Friends of East Hampton Airport, Inc., Helicopter Association International, Inc., et al v. Town of East Hampton in regard to airport noise and access restrictions - unanimous decision of the US Court of Appeals for the Second Circuit adopting my position, November 4, 2016. Writ of certiorari denied by the US Supreme Court, 2017. Now national law.
- Delta Air Lines, Inc. et al, Southwest Airlines Co. v. United States Department of Transportation and Delta Air Lines, Inc., and In Re Compliance With Federal Obligations by The City of Dallas, Texas in regard to airport competition plans and gate usage by new entrants - ongoing before the US Court of Appeals for the Fifth Circuit
- Lead counsel: Construction, zoning approval, certification, and registration of numerous heliports for Hospital Corporation of America
- Sale of Olive Branch, Mississippi airport - busiest airport in the State of Mississippi - from a private sponsor to The City of Olive Branch.

**Senior Counsel**                                                                               **2009 to 2013**
**Crowell & Moring, LLP, Washington, DC**

Senior counsel at AmLaw 100 international firm, representing and counseling a wide variety of leading aviation stakeholders.
- Created business-based Customs and Border Protection Service documentation eliminating bureaucratic requirements and facilitating the first-ever public-private partnership airport/land international border crossing between Tijuana, Mexico and Otay Mesa, California
- Co-authored comments on behalf of the Air Transport Association (ATA, now Airlines for America or A4A) opposing the FAA's proposed pilot flight/duty time rules (Docket FAA-2009-1093), garnering unanimous support among ATA members, substantially achieving their objectives, and avoiding protracted federal litigation and expense
- In the absence of applicable federal regulations and as an exception to policy, persuaded the FAA to permit client to fly multiple unmanned aerial systems in Lower Manhattan as part fo a product promotion
- Successfully fought National Park Service on behalf of Helicopter Association International, Inc. and its members to prevent further modifications to the definition of "natural quiet" over the Grand Canyon National Park

- Counseled the Metropolitan Washington Airports Authority on procurement and regulatory matters
- Secured a long-term fixed-base operator lease for Executive Air Transport, Inc. at Grand Rapids, Michigan, airport notwithstanding opposition of several competitors
- Guided the Association of Unmanned Vehicle Systems International (AUVSI) Board of Directors and Advocacy Committee on integration of unmanned aerial systems into the National Airspace System
- Won FAA and Florida Department of Transportation approval for Hospital Corporation of America in regard to construction and registration of numerous vigorously opposed trauma center heliports
- Secured ground water remediation plan for Lockheed Martin consistent with airport runway approach surfaces and obstruction minimums, Sarasota-Bradenton International Airport, Florida
- Directed The Paradies Shops on successful airport concession disadvantaged business enterprise (ACDBE) audits
- Counseled Enterprise Rent-A-Car in revenue use and diversion matters including the current Nevada class action suit targeting McCarran International and Reno-Tahoe International

**Special Counsel to the Managing Director**                    **2006-2007**
**Federal Communications Commission, Washington, DC**

- Laid groundwork for substantial improvements in federal procurement speed and accuracy

**Chief Operating Officer**                    **2004-2006**
**HyVee Equipment, LLC, Clarksville, TN**

- Increased orders for start-up aviation defense contractor by over 200%

**Partner**                    **1986-2004**
**Stokes, Bartholomew, Evans & Petree, P.A. (now Adams & Reese), Nashville, TN**

- Executive Assistant to the President, General Counsel to the Board of Commissioners, Metropolitan Nashville (TN) Airport Authority, an independent, business-based governmental entity
- Headed all MNAA departments on a transitional basis, offered the position permanently
- Instrumental in developing the Airport Authority's first-ever strategic plan with comprehensive goals and objectives in support of accomplishing its mission and performance based compensation for Authority management
- Consistently met budgets and beat schedules
- Co-authored the Airport Noise Reduction Reimbursement Act of 1989 permitting the first advance funding of airport noise mitigation projects in the nation
- Co-authored and persuaded FAA to be directly involved in production of an air carrier runway Environmental Impact Statement, now mandated as environmental streamlining in Vision 100 — Century of Aviation Reauthorization Act (Public Law 108-176)
- Authored the nation's first Letter of Intent securing federal funding commitment for an airport construction project in advance of appropriations, thus inventing an airport infrastructure finance system which now yields approximately $7 billion in safety, security, and capacity investment annually

- Senior member, construction team on over $500 million in public facilities, including two air carrier runways and the major extension of a third
- Personally concluded all related land acquisition and condemnation, zoning, obstruction evaluation, noise mitigation, relocation assistance, and utility relocation and successfully defended all court challenges
- As MNAA Director of Properties, negotiated all concession agreements for the operation of a 44-gate air carrier passenger terminal and managed all non-aeronautical commercial real estate
- Instrumental in accelerating, by 25 years, the construction of an air carrier runway
- Negotiated agreement with Tennessee Department of Transportation permitting 97-day, start-to-finish realignment of federal highway through tunnel under air carrier runway

**Earlier Career**

**US Army, Judge Advocate General's Corps**
**1976-1986**

- Prosecutor, Chief of Legal Assistance, and Senior Defense Counsel, 101st Airborne Division (Air Assault), Fort Campbell, KY — received Meritorious Service Medal
- Regional Counsel, US Army Criminal Investigation Command, Seoul, Republic of South Korea — received Army Commendation Medal
- Led a team of six defense counsel which achieved acquittals at trial on a weekly basis in a jurisdiction of over 22,000 soldiers – received Meritorious Service Medal
- Led the Legal Services Center producing all judicial, non-judicial, and administrative discharge documentation for the largest division in the US Army while continuing as the sole prosecutor for three combat brigades – received Meritorious Service Medal

**US Army, Infantry 1973-1976**

- Rifle, Weapons, and Heavy Mortar Platoon Leader in the 82d Airborne Division, Fort Bragg, NC, commanding over fifty soldiers with an 18-hour worldwide deployability mission — received Army Commendation Medal
- Turned around a heavy mortar platoon "that couldn't shoot straight" and, in less than a year, led it to achieve an "outstanding" rating on its annual evaluation
- Devised a way to lawfully feed four meals a day to an Infantry company in the field on a 24-hour per day mission when others said only three meals were authorized by Army regulation – received Army Commendation Medal

**Education and Background**

- Bachelor of Science, United States Military Academy at West Point, 1973, Dean's List, 1969-1973, graduated top 15% of class, exchange student to Nicaragua, 1971
- Doctor of Jurisprudence, The University of Texas at Austin, 1979, one of 25 active duty Army officers selected worldwide to study law while receiving full pay and tuition
- Graduate, Officers' Graduate Course (ABA recognized Master of Laws curriculum), The Judge Advocate General's School of the US Army, 1983
- Ranger, Airborne, Jumpmaster, and Air Assault Qualified
- Certified Member, American Association of Airport Executives, 1993

- Chairman and Vice Chairman, Legal Affairs Committee, Airports Council International - North America, 1997-1999
- Member, Disciplinary Hearing Committee, Board of Professional Responsibility of the Tennessee Supreme Court, 1992-2002
- First President of The Heart Gala, Inc. in Nashville to raise over $1 million for the American Heart Association in one year, 1998
- Eagle Scout, 1965
- Bachelor of Boy Scout Science Degree, The University of Scouting, 2012
- Order of the Arrow Vigil Honor and District Award of Merit, 2013
- National Outstanding Eagle Scout Award, 2015
- Doctor of Boy Scout Science Degree, The University of Scouting, 2016
- Boy Scouts of America Silver Beaver Award for Distinguished Service to Youth, 2017
- Numerous other Scouting awards including
    - Order of the Arrow Founder's Award
    - Order of the Arrow Lodge Key Three Certificate of Excellence
    - God and Service Award
    - Unit Leader Award of Merit
    - Scoutmaster's Key
    - District Committee Key
    - Wood Badge for the 21st Century
- Private pilot

BEFORE THE U.S. FEDERAL AVIATION ADMINISTRATION

IN RE: NASHVILLE INTERNATIONAL AIRPORT                )
                                                                                       )
DISPUTE OVER GOVERNANCE OF, AND OPERATIONAL        )_
RESPONSIBILITY FOR, NASHVILLE INTERNATIONAL AIRPORT )

## MOTION OF METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY FOR ADMINISTRATIVE STAY

### TO THE FOLLOWING BY EMAIL:

William (Liam) McKenna, Esq.            Daniel T. Edwards
Chief Counsel                          Associate Administrator for Airports
FEDERAL AVIATION ADMINISTRATION        800 Independence Avenue, SW
800 Independence Avenue, SW            Washington, D.C. 20591
Washington, D.C. 20591                 FEDERAL AVIATION ADMINISTRATION
Email: liam.mckenna@faa.gov            Email: daniel.edwards@faa.gov

Pursuant to Rule 18(a), FRAP, and D.C. Circuit Rule 18, Movant the Metropolitan

Government of Nashville and Davidson County ("Metro Nashville"), hereby moves the Federal

Aviation Administration ("FAA") to stay any action that FAA might otherwise undertake to

approve, recognize, or otherwise permit the attempt by the State of Tennessee ("State") to transfer

governance, sponsorship, ownership, or operational responsibility for Nashville International

Airport ("BNA") and John C. Tune Airport ("JWN"), (collectively "Airports") away from Metro

Nashville and to the State through the State's reconstitution of a newly enabled board of

commissioners for the Metropolitan Nashville Airport Authority ("MNAA" or "Authority").

Pursuant to Section 757 of the FAA Reauthorization Act of 2024, the FAA Administrator

has "sole legal authority" to authorize transferring operational responsibility for the Airports to the

newly created State board, but the FAA may not lawfully approve or even begin its evaluation of



the disputed changes at this time. Therefore, the FAA is not authorized to take or withhold action that permits the reconstituted State board to assume operational responsibility on July 1, 2026 when Chapter 978 of the 2026 Tennessee Public Acts goes into effect.

Metro Nashville created the Authority, which in turn owns and operates, and is the federally-recognized "sponsor" of, the Nashville International Airport ("BNA" or "Airport"). Pursuant to Title 42 of the TN Code, MNAA is the agency and instrumentality of Metro Nashville while at the same time being an independent governmental entity. Metro Nashville nominates and confirms the MNAA Board of Commissioners in whom is vested all power of MNAA under Title 42.

This Motion turns on a single, dispositive issue: under Section 757(b)(1) of the FAA Reauthorization Act of 2024, the FAA *shall not approve* a disputed change in airport sponsorship unless one of three conditions is met—none of which exists here. Any FAA recognition of the State-appointed board at this stage would violate federal statute and expose the agency to immediate judicial reversal. There also will be irreparable harm to Metro Nashville and the public interest if the FAA allows the State to introduce an unprecedent level of chaos into critical airport governance and operations.

This Motion is made pursuant to the above-referenced rules as a precursor to Metro Nashville filing a motion for stay to be acted on by the D.C. Circuit in the event that the FAA does not grant the request for stay set forth in this Motion and through its actions and withholding of actions, unlawfully approves the transfer unlawfully authorizes the newly created State-controlled entity to assume operational responsibility for the Airports in violation of Section 757.

Because the State of Tennessee intends to wrest control of the Airport from Metro Nashville as early as this Wednesday, July 1, 2026, time is very much of the essence and Metro

2

Nashville requests <u>that the FAA rule on this Motion by 5:00 pm Eastern Daylight Time, tomorrow, Tuesday June 30, 2026</u>.

## FAA HAS BEEN PROVIDED THE BASIS FOR THIS MOTION

Metro Nashville first presented its concerns in writing to the FAA on May 20, 2026, and despite repeated promises by FAA that the agency would substantively respond to Metro Nashville's concerns about the State takeover of the Airport board, the FAA has still to this day failed to offer any substantive response whatsoever.

Rather than restate all of the information from the letter that undersigned counsel emailed to FAA yesterday (June 28, 2026) (the "June 28 Letter") (which is attached hereto), Movant is hereby incorporating by reference the language from the June 28 Letter, plus the Declaration of D. Kirk Shaffer ("Shaffer Declaration") that was attached thereto.

As the June 28 Letter made clear, the State's attempt to change in both governance and ownership of the Authority sought by the State as a result of the recently enacted HB2507/SB2473 (as amended) (the "2026 Act") is unlawful, and that the FAA may not approve such efforts by the State at this time because of the mandatory requirements imposed on the FAA by Section 757.

Metro Nashville has presented the issues clearly to FAA and sought assurance from the FAA that the FAA will continue to recognize the current MNAA board pending resolution of the disputed change of Airport sponsorship. However, FAA has remained silent in the face of Metro Nashville's repeated requests for assurance.

The litigation styled *Metropolitan Government of Nashville and Davidson County and Metropolitan Nashville Airport Authority v. Bill Lee*, Case No. 3:26-cv-00793 (M.D. Tenn.) (Campbell, J) (the "BNA Dispute Federal Court District Litigation"), remains pending. On this basis alone, FAA is legally prohibited by Section 757 from approving the transfer and recognizing

3

the State's slate of newly appointed MNAA board members as the new leadership of the BNA Airport sponsor. Yet FAA continues to not respond to Metro Nashville's requests for assurance that the requirements of Section 757 will be honored by the FAA.

The administrative stay that is requested by Metro Nashville at this time is that the FAA agree not to recognize the State-appointed board members as legitimate members of the MNAA board authorized to assume operational responsibility for the Airports at least until one of the following occurs:

1) A final non-appealable judgment is issued in the BNA Dispute Federal Court District Litigation; or

2) A final, non-appealable judgment is issued by the U.S. Court of Appeals for the D.C. Circuit that the FAA has not violated its obligations under Section 757.

## AN ADMINISTRATION STAY IS MANDATED UNDER THE CIRCUMSTANCES

Given the fact that Section 757 clearly instructs FAA not to approve of the State's attempted takeover of the Airport board at least until the pending litigation has terminated, it is beyond any reasonable doubt that the FAA must at this time enter the administrative stay sought by Metro Nashville. All the requirements for a stay are easily satisfied here.

A party who moves for a stay or injunction pending appeal bears the burden of showing the balance of four factors weigh in favor of the stay/injunction: (1) the likelihood that the party will prevail on the merits of the appeal; (2) the likelihood that the party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting a stay. *United States v. Philip Morris USA, Inc.*, 449 F.Supp.2d 988, 990 (D.D.C. 2006) (delineating factors to be considered in determining whether stay pending appeal is warranted) (citing *Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C.Cir.1985)); *Resolution Trust Corp. v. Burke*, 874 F. Supp. 23, 25 (D.D.C.1995) (evaluating

4

motion to stay enforcement of subpoenas pending appeal under same four factor test). A party does not necessarily have to make a strong showing with respect to the first factor (likelihood of success on the merits) if a strong showing is made as to the second factor (likelihood of irreparable harm), *McCammon v. United States*, 588 F.Supp.2d 43, 47 (D.D.C. 2008), and *vice versa*; *See Cuomo*, 772 F.2d at 73 ("[p]robability of success is inversely proportional to the degree of irreparable injury evidenced. A stay may be granted with either a high probability of success and some injury, or *vice versa* ).

## I.    THERE IS A STRONG LIKELIHOOD THAT A COURT WOULD CONCLUDE THAT SECTION 757 CLEARLY PROHIBITS FAA APPROVAL OF THE STATE-COMPELLED CHANGE IN GOVERNANCE AT THIS TIME.

There is a strong likelihood that Metro Nashville will succeed on the merits of its claim before the D.C. Circuit that FAA will have violated Section 757 if it approves the State-appointed board members to replace the current board members while the BNA Dispute Federal District Litigation remains pending. Because Section 757(b)(1) imposes a mandatory prohibition, and no exception applies, Metro Nashville's likelihood of success is not merely strong—it is overwhelming. The law forbids what the State urges, and only an administrative stay will ensure the FAA complies with that mandate.

## II.    METRO NASVHILLE WILL SUFFER IRREPARABLE HARM IF THE STAY IS NOT ISSUED.

For the reasons set forth in the June 28 Letter and attached Shaffer Declaration, Metro Nashville will be irreparably harmed absent a stay. This is patently obvious from the facts: As a result of the State's improper attempted takeover of the board, and FAA's refusal to comply with its obligations under Section 757, there will be chaos in Nashville as to which entity and personnel speaks for and kind bind the Airport board and executives.  It will cause an unprecedented

5

leadership morass. Among other things, the dispute over which slate of board members has the authority to speak for and bind the Airport will:

- Generate immediate conflict and confusion over who has authority to approve/sign contracts, oversee major construction projects, and coordinate/interface with air carriers, other major stakeholders, and the FAA;

-  Upend MNAA's $3 billion development plan by inserting politicians rather than trained, experienced airport professionals into the budgetary and capital development plan process; and

- Immediately harm BNA goodwill and its reputation that the Airport has spent years to develop with airlines and other numerous other high-dollar stakeholders.

*See* Shaffer Decl., ¶¶ 19-20. It is extremely difficult for a major airport to recover from such a fiasco – but that is what FAA invites by its failure to comply at this time with Section 757.

This Motion seeks only to preserve the long-standing status quo pending judicial resolution. By contrast, absent immediate relief, the State's takeover will occur within days, triggering precisely the governance chaos Congress enacted Section 757 to prevent. Moreover, the likelihood of success is so strong here – *i.e.,* that the FAA must comply with Congressional directives in Section 757 – that the requirement of demonstrating irreparable harm is less than it otherwise might need to be. Actions taken by an improperly recognized board cannot be easily unwound, particularly in agreements with third parties.

## III.    THERE WOULD BE NO COUNTERVAILING HARM TO OTHER PARTIES IF THE STAY IS ISSUED.

Maintaining the status quo imposes no meaningful burden on FAA, the State, or third parties. The board that has been in place will continue to govern the Airport. No harm can be alleged from that status quo.

6

## IV.    THE PUBLIC INTEREST WOULD BENEFIT FROM A STAY.

The public interest will be served by FAA not causing confusion at the Airport and surrounding community by approving the disputed slate of new board members. The public interest strongly favors adherence to federal law, regulatory stability, and continuity in the management of a major commercial airport that serves interstate commerce.

## CONCLUSION

WHEREFORE, Metro Nashville respectfully moves the FAA to stay any decision by the FAA to approve the State-appointed members of the MNAA board at this time. Failure of the FAA to act on this Motion by 5:00 pm Eastern Daylight Time tomorrow, Tuesday, June 30, 2026, will be deemed a denial of this Motion for Stay.

Respectfully submitted,

CLARK HILL

*Roy Goldberg*

Roy Goldberg
COUNSEL FOR
METROPOLITAN GOVERNMENT OF
NASHVILLE & DAVIDSON COUNTY[1]

**ENCLOSURES**

Letter dated June 28, 2026
and Attached Shaffer Declaration

**COPY RECIPIENTS:**

Wallace D. Dietz, Esq.
Director of Law
METROPOLITAN GOVERNMENT OF NASHVILLE
& DAVIDSON COUNTY

---

[1]The Clark Hill D.C. office is currently 1001 Pennsylvania Avenue, N.W., Suite 1300 S (2004) but will change to 601 13th Street, N.W., Suite 600 S (2005) on July 13, 2026.

7

Robert E. Cooper, Jr., Esq.
BASS, BERRY & SIMS, PLC
Bob.cooper@bassberry.com
Jeffrey P. Yarbro, Esq.
BASS, BERRY & SIMS, PLC
jyarbro@bassberry.com
COUNSEL FOR METROPOLITAN GOVERNMENT OF NASHVILLE
& DAVIDSON COUNTY

D. Kirk Shaffer, Esq.
D. KIRK SHAFFER PLLC
CONSULTANT TO THE METROPOLITAN GOVERNMENT OF NASHVILLE
& DAVIDSON COUNTY

Phillip F. Cramer, Esq.
W. Campbell Haynes, Esq.
SPERLING KENNY NACHWALTER LLC
pcramer@sperlingkenny.com
chaynes@sperlingkenny.com
COUNSEL FOR METROPOLITAN NASHVILLE AIRPORT AUTHORITY

The Honorable Bryan Bedford
Administrator
Email: bryan.bedford@faa.gov

The Honorable Christopher Rocheleau
Deputy FAA Administrator
FEDERAL AVIATION ADMINISTRATION
Email: chris.rocheleau@faa.gov

The Honorable Daniel J. Edwards
Krystyna Bednarczyk, Esq.
Assistant Chief Counsel for Airports and Environmental Law
FEDERAL AVIATION ADMINISTRATION
Krystyna.Bednarczyk@faa.gov

Gregory Zerzan, Esq.
General Counsel
U.S. DEPARTMENT OF TRANSPORTATION
Gregory.zerzan@dot.gov

8